**Mark Bradford (MB 6002)**
**MARK BRADFORD, PC**
**299 12th Street**
**Brooklyn, New York 11215-4903**
**Telephone: (347) 413-3287**
**mb@markbradfordpc.com**

**Cara R. Burns (CB 1071)**
**MIMS, KAPLAN, BURNS & GARRETSON (PHV to be requested)**
**28202 Cabot Road, Ste 300**
**Laguna Niguel, California 92677**
**Telephone: (310) 314-1721**
**Facsimile: (949) 340-9737**
**cburns@hmkblawyers.com**

**Attorneys for Plaintiff**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **MERCH TRAFFIC, LLC,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**JOHN DOES 1-100, JANE DOES 1-100, AND XYZ COMPANY,**<br><br>**Defendants.** | **CIVIL ACTION NO. 1:26-cv-7030 JPC**<br><br>**DECLARATION OF EMILY HOLT IN SUPPORT OF EX PARTE APPLICATION FOR A TEMPORARY RESTRAINING ORDER, SEIZURE ORDER AND AN ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION AND SEIZURE ORDER SHOULD NOT ISSUE** |

I, Emily Holt, hereby declare as follows:

1. I make this declaration in support of Merch Traffic, LLC's ("Plaintiff") ex-parte application for a temporary restraining order, seizure order, and an order to show cause why a preliminary injunction and seizure order should not issue in the above referenced matter to halt the sale of merchandise and to seize the same bearing the "Artist's Trademarks", namely the federally registered trademark, service marks, likenesses, logos and other indicia of the performer known as

"HARRY STYLES" (the "Artist") during his sold-out residency concerts to be held on August 26, 2026 through October 31, 2026 at Madison Square Garden in New York, New York (collectively, the "Residency Concerts"). The tour has begun and Bootleggers have sold their infringing merchandise at the Artist's concerts. See paragraph 11 below and Exhibit C hereto. Similar tour seizure orders have been granted by this District Court for this Artist and for other performers' tours, including Merch Traffic, LLC. v. Does, Case No. 22-cv-6839 AT (S.D. NY 2022) (Judge Torres) (for Harry Styles' tour), and Merch Traffic, LLC. v. Does, Case No. 21-cv-8283 AT (S.D. NY 2021) (Judge Torres) (for Harry Styles' tour), and for the Artist's prior group, ONE DIRECTION, F.E.A., Inc. v. Does, Case No 12-CV-3999 TPG (S.D. NY 2012) (Judge Griesa) (for One Directions' tour). See Certificate of Counsel and Exhibits thereto. Notably these tour seizure orders are for performers when their concerts occur at venues throughout the United States. Here, Plaintiff seeks a seizure order for the Artist's Residency Concerts occurring only at Madison Square Garden. I have personal knowledge of the facts set forth herein and am authorized by Plaintiff to make this declaration. If called as a witness, I could and would be able to testify competently to such facts.

2. I am the Vice President of Business and Legal Affairs for Plaintiff, formerly known as Live Nation Merchandise, Inc., which previously acquired the merchandising company F.E.A., Inc. I have been employed by Plaintiff for approximately 4 years and previously at Bravado International Group Merchandising Services, Inc. for approximately 5 years in a similar position. Before these, I worked at Burberry, PLC (the Burberry fashion brand) in the Brand Protection division working specifically on assessing counterfeit and other intellectual property violations of the brand, and at private law firms specializing in intellectual property antipiracy and protection matters. I also studied at the World Intellectual Property Organization (also known as "WIPO")

in Geneva, Switzerland, a leading intellectual property organization that is an agency of the United Nations that promotes the protection of intellectual property throughout the world. As part of my duties at Plaintiff, I oversee Plaintiff's merchandising and antipiracy efforts for performers' tours and online sales.

3. Plaintiff is engaged in the business of manufacturing, distributing and selling authorized merchandise such as T-shirts, sweatshirts, and posters, among other merchandise bearing the trademarks, service marks, likenesses, logos, and other indicia owned by popular performers. Plaintiff has obtained the exclusive right from the Artist to distribute authorized merchandise bearing any or all of the Artist's Trademarks (collectively "Authorized Merchandise") at the Artist's Residency Concerts. A list of the Artist's Residency Concerts dates is attached as Exhibit A and is incorporated by this reference as though fully set forth herein.

4. "HARRY STYLES" is the trademark of this very prominent and successful musical performer. While the secondary meaning to the Artist's name is evidenced by the fact that he is playing the Residency Concerts – 30 sold-out concerts between August 26, 2026 through October 31, 2026 at Madison Square Garden – his background is as follows. The Artist began performing in 2010 and later appeared on the popular show "X Factor", as part of the group ONE DIRECTION, and has been a solo artist since 2016. The Artist has released 4 albums, including his recently released "Kiss All the Time. Disco, Occasionally." Rolling Stone magazine named his albums, "Fine Lines" and "Harry's House" as two of the 500 Greatest Albums of All Time. The Artist's well known singles include "Watermelon Sugar" (streamed over 3.3 billion times on music streaming service Spotify and its video viewed over 432 million times on YouTube.com), "Sign of the Times" (streamed over 2.3 billion times on Spotify and its video viewed over 1.5 billion times on YouTube.com), "As It Was" (streamed over 4.5 billion times on Spotify and its

video viewed over 982 million times on YouTube.com), and "Adore You" (streamed over 2.1 billion times on Spotify and its video viewed over 482 million times on YouTube.com). The Artist has been featured in movies distributed nationwide, including "Dunkirk", "The Eternals", and "Don't Worry Darling". The Artist has appeared on Saturday Night Live eight times, including twice as both the host and musical artist, most recently on March 14, 2026. The Artist has been nominated for and won numerous awards including winning: the National Academy of Recording Arts and Sciences "Grammy" award in 2023 for Best Pop Vocal Album and Album of the Year and in 2021 for Best Pop Vocal; Billboard's (a music trade publication) 2020 Chart Achievement Award; and Variety Magazine's 2020 Hitmaker of the Year Award. The Artist has also appeared in numerous magazines distributed nationwide including on the cover of Vogue in December 2020 (being the first individual male to appear on its cover), the Wall Street Journal (including on January 24, 2026) and Rolling Stone.

5. The Artist has obtained a US Federal Trademark registration for his HARRY STYLES trademark: Federal Registration Number 5688195 for use in connection with International Class ("IC") 025 for clothing, namely, T-shirts, shirts, jackets, sweatshirts, hooded tops, hooded sweatshirts, pullovers, jumpers, shorts, boxer shorts, boxer briefs, underwear, underclothes, under garments, socks, scarves, dressing gowns, pajamas, dungarees, braces, ties, lingerie, hosiery, bathing suits, bathing trunks, bathrobes, gloves, jeans, kilts, nightwear, pajamas, slacks, sleeping garments, sleepwear, suits, swim wear, and trousers, among other items of clothing; IC 041 for entertainment in the nature of participation in musical recordings, musical performances, performances by a musical groups and members thereof, celebrity interviews, performance of spoken word, participation in artistic performances, and participation in concerts, among other related services; IC 016 for printed matter, namely, magazines, newspapers,

newsletters, books, brochures, flyers, pamphlets, posters, decals, bumper stickers, postcards, pictures, diaries, souvenir event programs, printed event and concert tickets, calendars, photographs, signed photographs, picture books, and songbooks, among other printed matter; and IC 009 for pre-recorded CDs, DVDs, digital audio tapes, digital audio cassettes, high definition video discs, mini-discs, video records, video tapes, video cassettes, video discs and flash drives featuring music, musical recordings, musical performances, musical entertainers, motion picture films, and artistic performances, among other services. The trademark is incontestable.

6. The Artist's Residency Concerts are highly anticipated; all concerts are sold out. Because of the Artist's status among popular music enthusiasts, these are expected to be a very successful. Sales of Authorized Merchandise are expected to be very substantial.

7. The Artist derive incomes and promotes his image in part from sales of recordings and live performances, and in part through the sale of merchandise associated with him. The Artist and Plaintiff spend a great deal of care, time and money in developing the Authorized Merchandise bearing the Artist's Trademarks, including making sure they are high quality and are appropriate to their image. Plaintiff pays sales tax on each sale and pays its many employees and third parties to create, manufacture, distribute and sell the Authorized Merchandise, including local individuals.

8. Authorized Merchandise is sold only at specific locations at Madison Square Garden and potentially at temporary ("pop up") locations nearby. These locations have a variety of different authorized merchandise for consumers to buy.

9. Concerts by the Artist and other performers of his stature have recurring problems with individuals who sell infringing merchandise near, at and sometime inside each concert venue. These individuals are referred to as "Bootleggers," their activities are known as "Bootlegging" and their goods are referred to as "Bootleg Merchandise" or "Infringing Merchandise."

10. To combat such illegal activities on major concert tours, Plaintiff has obtained temporary restraining orders and seizure orders, and thereafter preliminary injunctions and multidistrict seizure orders to seize the Infringing Merchandise from the Defendant Bootleggers, including for the Artist's prior tours, including with his prior group. See Certificate of Counsel Exhibit A thereto filled herewith.

11. The lure for Defendant Bootleggers to sell their Infringing Merchandise at the Residency Concerts is especially great since the Artist will be performing at one location in Manhattan for over 2 months and each concert is sold out. Reinforcing this fact is that during prior tours for the Artist, Defendant Bootleggers appeared at his concerts throughout the United States to attempt to sell their Infringing Merchandise. See, for example true and correct copies of photographs taken of some Bootleggers selling their Infringing Merchandise during the Artist's prior tour at Madison Square Garden, attached hereto as Exhibit B. Further, this current tour by the Artist began outside of the United States, and Bootleggers appeared to sell Infringing Merchandise. See true and correct of photographs taken of some Bootleggers selling their Infringing Merchandise during the Artist's July 31 and August 1, 2026 concerts at GNP Stadium in Iztacalco, Mexico City, Mexico, attached hereto as Exhibit C.

12. Further indicative of the demand for Plaintiff's Authorized Merchandise - unauthorized sellers are attempting to sell infringing products bearing the Artist's Trademarks and referencing the Residency Concerts and/or its schedule on various websites. True and correct copies of the webpages of a few of these unauthorized sellers with stores on eBay are attached hereto as Exhibit D.

13. Defendant Bootleggers attempt to sell their Infringing Merchandise at and near the concert venues, including before the concerts, which preempts Plaintiff's ability to sell Authorized

Merchandise. Further, they drastically undercut Plaintiff's price. For example, generally Defendant Bootleggers offered to sell infringing merchandise for about 50% or less on average than Plaintiff's authorized merchandise, but most Defendant Bootleggers are willing to sell for less if asked and especially at the end of the night. Defendant Bootleggers sell their infringing merchandise along the roads near the concert venue and in parking lots, both of which also interferes with traffic and creates safety problems. The Defendant Bootleggers' infringing merchandise is predominately printed on "seconds," which is indicated by their manufacturer by splitting the hangtags, removing the hangtags, or other markings such as a line through the label. "Seconds" are inferior quality merchandise and usually are sold by the manufacturer for substantially less than first quality goods, another reason Defendants can sell their infringing merchandise for a lot less.

14. In the present circumstances, given the Artist's popularity, it is not difficult to understand the motives of the Defendants. The Residency Concerts are sold out. The Artist's will perform before hundreds of thousands of people by the Residency Concerts' end. The fans attending concerts frequently seek to purchase a souvenir, such as a T-shirt. Plaintiff's business is built on this – authorized performers' merchandise. Defendant Bootleggers are typically located outside the venues and therefore have the first and last opportunity to make these sales.

15. Based on my extensive experience in this area, as well as the observed and documented activities of the Defendant Bootleggers on this particular Artist's prior tours, without the order Plaintiff seeks, when members of my staff inform the Defendants that they are selling Infringing Merchandise, they usually just walk away and/or continue to sell the Infringing Merchandise. The Defendants do not respond when we ask for their names. All Defendants ignore requests to stop selling infringing merchandise. The Defendant Bootleggers respond that they

want to see our "injunction" or "order" or else they will not stop their unlawful activities. From the nature and context of their statements, it is obvious that the "injunction" or "order" they refer to is the search, order that we seek from this Court. As noted above, the Infringing Merchandise they sell and offer for sale had the places where the tour would be performing. The Infringing Merchandise contained the Artist's trademarks, as well as designs, images and logos of the Artist which are exclusively licensed to Plaintiff to be sold at venues.

16. Further, I have had numerous interactions with Defendant Bootleggers at concerts. For example, on August 13, 2025 at MetLife Stadium in East Rutherford, New Jersey, I attended a concert for another performer that Plaintiff holds the exclusive tour merchandise rights. There, I spoke with several Bootleggers at the concert and was able to negotiate the price of a long-sleeved infringing T-shirt, down to about 50 percent or less than the price of our (Plaintiff's) authorized legitimate T-shirt. That is because unlike Plaintiff, the Defendant Bootleggers do not have to pay the hundreds of people who are involved with the creation, manufacture, distribution and sale of legitimate, first quality products, and it is highly doubtful that they pay federal, state or local taxes on their sales. Further, no Bootlegger would take a credit card, and no Bootlegger would give me a receipt.

17. In addition, on August 5, 2026, I attended at Madison Square Garden a concert by the performer Hilary Duff (not one of Plaintiff's performers). She had 2 sold out concerts there. I saw at least 40 bootleggers selling what I assume is infringing merchandise containing her name and likeness, since the items were sold out of bags, on the streets, and not at any authorized location at Madison Square Garden. I am informed and believe there was no seizure order in place. See true and correct copies of photographs taken of some the Bootleggers selling what appears to be infringing merchandise outside of Madison Square Garden, attached hereto as Exhibit E.

18. Defendants' bootlegging activities greatly injure performers, such as the Artist, and legitimate merchandisers, such as Plaintiff, in several ways. The Defendants are not bound by contract to provide first-quality apparel and graphic designs, as is required of the Plaintiff. Further, and as noted above, the Defendants can drastically undersell us, a legitimate merchandiser, because, unlike Plaintiff, Defendants have no obligation to pay the Artist royalties or pay any part of their sales to the venue.

19. The consumer, the fans of the Artist, also suffer. As noted above, Infringing Merchandise is often an inferior imitation which is not well-made; often they are printed on second quality merchandise and the unauthorized designs are poor. The fans are disappointed and, in their confusion as to the source of the Infringing Merchandise, blame the performers. This affects future legitimate sales and tends to create a negative feeling by the fans directed at the performers, which may in turn cause decreased record sales and concert attendance.

20. The Defendants' Infringing Merchandise is intended and will cause the public to believe that their Infringing Merchandise is authorized, approved and sponsored by the Artist. Consequently, not only does the sale of this Infringing Merchandise violate Plaintiff's exclusive rights, but also causes the public to be adversely affected and irreparably harms Plaintiff's and the Artist's reputation for excellence and integrity in the legitimate Authorized Merchandise.

21. The unchallenged presence of Defendant Bootleggers in our marketplace severely damages the market and Plaintiff's business at every level. The precise damage to Plaintiff is incalculable. Based on Plaintiff's experience with such Defendants, I believe these Defendants would dispose of or destroy any Infringing Merchandise or related documents should legal proceedings be commenced against them. Further, the incalculable damage caused by the Defendants deprives the rightful owners of their return. Accordingly, we seek to curtail the

Bootlegging activities of the Defendants by seeking the assistance of this Honorable Court to obtain an order allowing the seizure of Infringing Merchandise.

22. The people who serve the orders and seize Infringing Merchandise consist usually of off-duty law enforcement officers who are well versed in seizing Infringing Merchandise. They will seize only the Infringing Merchandise and offer receipts. They do not make arrests. Their main objectives are to serve the restraining and seizure order, preserve the Infringing Merchandise, see if Defendants Bootleggers will provide contact information, and offer a receipt.

23. I believe the difficulties in identifying Defendant Bootleggers, including that they have no fixed place of business and no assignable assets, makes them virtually immune to normal process or to any process except by way of restraining order against persons unknown to allow the seizure of the Infringing Merchandise pending a final disposition by this Court.

24. Plaintiff is a substantial and successful business and will be able to meet an order made to compensate any Defendant for damages suffered because of any order obtained on our behalf. However, in my experience, no Defendant Bootlegger has ever appeared at an order to show cause hearing or sought relief in any of the prior tour seizure orders granted. Plaintiff also requests that it be appointed substitute custodian for the Infringing Merchandise it requests the Court to permit it to seize.

25. In sum, absent protection from a Court in the form of the requested seizure order, the Defendants have an insurmountable advantage over the performers and Plaintiff, the legitimate merchandiser who obtained the exclusive right to use Artist's trademarks, service marks, likenesses, logos and related rights. The injury is not only to the Plaintiff, but also to the consumers who buy the unlicensed, inferior goods. Further, experience has shown that the requested order is the only way to effectively stop the sale of Infringing Merchandise.

I declare under penalty of perjury under the laws of the United States and the State of New York that the foregoing is true and correct. Executed August 18, 2026.

**EMILY HOLT**